UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No:  20-CV-62355-RUIZ/STRAUSS

REMEMBER EVERYONE DEPLOYED INC.,

      Plaintiff,

v.

AC2T INC., *et al*.

      Defendants.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before me upon Defendants Spartan Mosquito and Jeremy Hirsch's Motion to Dismiss Plaintiff Remember Everyone Deployed, Inc.'s Complaint, and Memorandum of Law in Support ("Motion to Dismiss")[1] (DE 11).  The Motion to Dismiss seeks dismissal of Plaintiff's complaint on grounds that the Court lacks personal jurisdiction over the Defendants, or alternatively, that Plaintiff fails to state a claim with respect to Counts III (unfair competition under Florida common law) and IV (breach of contract).  *Id.* at 1-2.  The Honorable Rodolfo A. Ruiz II, United States District Judge, referred the Motion to Dismiss to me to take all action as required by law pursuant to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida.  (DE 27).  I have reviewed the Motion to Dismiss, the Response (DE 20), the Reply (DE 21) and the record and am otherwise duly advised in the premises.  For the reasons stated below, I respectfully **RECOMMEND** that the Motion to Dismiss be **GRANTED IN PART AND DENIED IN PART**.

---

[1] Defendants are AC2T, Inc., d/b/a Spartan Mosquito ("AC2T"), and Jeremy Hirsch (collectively, "Defendants").  (DE 11 at 1).

I.    **BACKGROUND**

On October 1, 2020, Plaintiff filed a five-count complaint ("Complaint") against Defendants in the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida alleging: (I) trademark infringement under Florida common law; (II) federal unfair competition under 15 U.S.C. § 1125(a) ("Lanham Act"); (III) unfair competition under Florida common law; (IV) breach of contract; and (V) fraudulent inducement.  (DE 1-1).  Plaintiff seeks damages and an injunction.  *Id.* at pp. 17-19.  The Complaint includes seventeen (17) exhibits.  *Id.* at pp. 20-107.  On November 18, 2020, Defendants filed a notice of removal.  (DE 1).  Defendant alleged removal is appropriate on the basis that this Court has subjection matter jurisdiction over the Lanham Act claim and thus has supplemental jurisdiction over the state law claims.  *Id.* Defendant also alleged that removal is proper because the Court has diversity jurisdiction over the state court action.  *Id.*

In the Complaint, Plaintiff alleged that it is a not-for-profit corporation, which is organized in Florida with principal places of business in Florida and North Carolina, providing charitable services and support to deployed military servicemembers and their families.  (DE 1-1 at ¶¶2-3, 11).  Plaintiff also alleged that Defendant AC2T provides pest control services and is incorporated in Mississippi with its principal place of business in Mississippi.  *Id.* at ¶¶4-5.  In addition, Plaintiff alleged that Defendant Hirsh, founder of Defendant AC2T, is an individual who resides in Mississippi.  *Id.* at ¶¶6-7.  Plaintiff averred that the Court has personal jurisdiction over Defendants because they solicited business within the state of Florida, entered into an agreement, and then breached the agreement in this state.  *Id.* at ¶¶9-10.

Relevant to its claims, Plaintiff alleged that its branding, since 2016, has encompassed the acronym "RED, R.E.D., Remember Everyone Deployed" and various domain names that utilize

the concept of supporting the deployed, e.g., remembereveryonedeployed.org, redsupport.com, rememberthedeployed.com, etc. *Id.* at ¶¶12-13. In addition, Plaintiff alleged that its branding includes a highly stylized logo involving the image of a globe with the "RED" wording superimposed, which "RED" wording is itself part of its branding:



(DE 1-1 at ¶14). Plaintiff also alleged that it is the owner of common law rights for these marks. *Id.* at ¶16.

As to the formation of an agreement, Plaintiff alleged that Defendant Hirsch contacted Plaintiff on December 20, 2019, unsolicited, to offer an opportunity to co-sponsor the NASCAR Cup Series based upon Plaintiff's reputation for charitable services and community involvement in and around Florida and North Carolina. *Id.* at ¶¶15, 17. In support of this allegation, Plaintiff referenced an email dated December 20, 2019 from Defendant Hirsh that is attached to the Complaint as Exhibit A, which states, in relevant part, the following:

> I was wondering if we could put your logo on [a sponsored driver's] car for a few, if not, all 17 races this year. While the car will also have our sponsorship information on it (I understand if you don't want us on the same car), we would also be interested in giving you the entire car for a race this year.

> I'm asking for the rights to use your logo on Nascar Cup Series car with our logo. If you do not want your logo with ours, we are also asking if you would like us to give you the entire car for a race this year. There is no charge for this ever. Further, the driver will make social media posts about your efforts, and provide 2-4 Hot passes to any race your logo is on the car.

(DE 1-1 at ¶¶17-18; p. 21).  Plaintiff's Founder/CEO, Gloria M. De Paul, responded to Defendant Hirsh on December 21, 2019 stating:

> It was a pleasure to speak with you.  I am blessed, to have your support with this mission.
>
> It would be an honor to accept, but if you could possibly send me a mockup of where the logo would be positioned and what it will look like.
>
> Attached is the logo and a few pictures . . .
>
> Seriously sir, it was so great talking with you . . . I live in Lauderdale by The Sea in Florida but I am visiting . . . will be back on the 29th.

*Id.* at p. 106.  On January 4, 2020, Defendant Hirsh responded with pictures reflecting placement of the logo and stating: "Here's what team wants to run for the Daytona 500—we have several other versions that will rollout through the season.  Are you OK with this to start the season?"  *Id.*

Plaintiff further alleged that Defendant Hirsh promised certain benefits to Plaintiff for co-sponsoring a car in the NASCAR Cup Series.  For example, Defendant Hirsch represented that the driver of the NASCAR car would post in social media about Plaintiff's charitable services.  *Id.* at ¶18.  Defendants also promised to make certain improvements to Plaintiff's website, in part by engaging with Plaintiff's established Facebook audience by responding to messages.  *Id.* at ¶20.  Defendant Hirsch requested, and received, a copy of Plaintiff's R.E.D. logo and access to Plaintiff's website and Facebook page in order to proceed as promised.  *Id.* at ¶¶19-21; pp. 23, 106-07.  In support of this allegation, Plaintiff's Complaint also attached email correspondence from Defendant Hirsh to roger@remembereveryonedeployed.org that is dated February 19, 2020 ("Feb. 19th Email"), which stated, in pertinent part:

> . . . so far we have agreed that [Defendant AC2T] will:
>
> Communications:

Fix your phone issue. . . . we will pay for this for at least the next 12 months and do it as soon as we are given authority. . . .

Fix Facebook issue.  We will be given the admin log in and password to your facebook page and we will respond to messages, manage ads, and ensure correct verbiage is used to grow your audience. . . . we will pay for this for at least the next 12 months and do it as soon as we are given authority.

Fix website issue.  We will be given the admin log in and password to your website. We will ensure only legal language is on your website and update speed of use . . . to be able to retarget your audiences on social and through google. –we will pay for all of this for at least the next 12 months and do it as soon as we are given authority.

Fix the monit[izat]ion of your website products. . . .

We will guarantee at least $52,000 in income for you over the next 12 months to cover travel related expenses.

Once your non-Profit is recognized again we can update your website language to ensure it is legal and enter in to a "contract" vs. just a memorandum of understanding.

We will Sponsor 8 full truck races ALL RED—NO [AC2T]. . . .

Let me know your thoughts.

(DE 1-1 at p. 23).  Additionally, the Complaint attached the following email ("First Feb. 26th Email") from Plaintiff to Defendants that was dated February 26, 2020:

> Good morning Jeremy,
>
> Please look below for login in admin administration of R.E.D Facebook page
>
> - There are few transition items with our current IT admin underway. Will send password for Website in a few hours.
>
> - Creating a detail outline, by subject matter, of our past overall strategic conversations to be deployed ASAP to be called "First Steps".  It ill include our mutual R.E.D social media, strategic marketing/Platform deployment.
>
> - As accord, please introduce and place me in the R.E.D-Spartan strategy IT and marketing team communication group and any other decision maker subject matter team.
>
> - All strategic thus far discussed and agreed, will be activated. by today. Our team is aware.
>
> best regards,

*Id.* at p. 103.  The Feb. 26th Email listed Roger Panta as signatory with the title of Executive VP for Remember Everyone Deployed and a mailing address in Jacksonville, North Carolina.  Later

in the day on February 26, 2020, Defendant Hirsh emailed to Mr. Panta a mockup of proposed changes to Plaintiff's website ("Second Feb. 26th Email). *Id.* at ¶25; p. 31. On March 3, 2020, Plaintiff sent Defendant Hirsh a letter detailing its vision for the website overhaul ("Mar. 3rd Letter"). *Id.* at ¶26. The Mar. 3rd Letter is signed by Mr. Panta and outlines initiatives for Plaintiff's website, which the letter declares upfront "are R.E.D's voice and path to be deployed." *Id.* at pp. 44-54. The letter ends with the statement: "Jeremy, may we set up a conference call at your earliest convenience to go over the initiatives delineated in this document." *Id.* at p. 53. After several missed attempts to connect by phone, Plaintiff alleged that Defendant Hirsh stopped communicating. *Id.* at ¶26.

Additionally, Plaintiff alleged that, in reliance on Defendant's promises, it provided Defendant Hirsh with confidential data and administrative access to its website and Facebook page and that Defendant Hirsh accessed these sites under the guise of making improvements while at the same time, on February 19, 2020, creating a competing website, www.remembereveryonedelployed.today. *Id.* at ¶¶21-23. Plaintiff discovered the competing website on April 17, 2020 and immediately emailed Defendant Hirsh regarding this discovery. *Id.* at ¶28. Defendant Hirsh responded that he was not sponsoring NASCAR because it was cancelled as a result of the COVID-19 pandemic. *Id.* at ¶29, pp. 77, 79. On May 1, 2020, Defendant Hirsh indicated that he would not continue to work with Plaintiff even if he did decide to sponsor NASCAR again. *Id.* at ¶30. Defendant Hirsch stated the following reasons for his decision: disregard for his earlier, factual emails regarding the COVID-19 situation; continued threats about legal action; the improper listing on Plaintiff's website of non-profit 501(c)(3) status; and Plaintiff's delayed removal of that assertion of status for one month following the removal request. *Id.* at p. 79.

The Complaint alleged that Defendants engaged in a bait and switch tactic. *Id.* at ¶32. Defendants redirected would-be visitors and donors of Plaintiff's website and Facebook platforms to their competing charitable services and platforms and used Plaintiff's branding and logo to promote their services and market shirts for sale, albeit with an inverted color scheme:



*Id.* at ¶¶27, 32. Plaintiff alleged that Defendants' actions caused actual confusion and cited examples. *Id.* at ¶¶36-40.  Plaintiff further alleged that during the weekend of September 27, 2020, an Instagram post by NASCAR driver Brennan Poole showed the "RED Logo" on the number 15 NASCAR car in Las Vegas, Nevada. *Id.* at ¶41.  Plaintiff also alleged that Defendants' acts were willful and done intentionally to trade on Plaintiff's goodwill and divert potential revenues from Plaintiff's charitable services to the Defendants. *Id.* at p. 42.

II.    **LEGAL STANDARD**

A. **Personal Jurisdiction**

On a motion to dismiss for lack of personal jurisdiction, "[t]he plaintiff bears the burden of making out a *prima facie* case for personal jurisdiction by presenting sufficient evidence to withstand a directed verdict motion." *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009).  Courts accept the plaintiff's factual allegations as true unless they are challenged. *Abramson v. Walt Disney Co.*, 132 F. App'x. 273, 275 (11th Cir. 2005) (citing *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990)).  A defendant may challenge personal jurisdiction "through affidavits, documents, or testimony." *Internet Sols. Corp.*, 557 F.3d at 1295.  Then, "the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents." *Id.* (internal

quotation marks and citation omitted). When jurisdiction is contested, all reasonable inferences are construed in favor of the plaintiff. *Abramson*, 132 F. App'x. at 275 (citing *Madara*, 916 F.2d at 1514).

Under a two-step inquiry to determine if personal jurisdiction exists, a district court asks (1) whether the forum state's long-arm statute provides a sufficient basis for personal jurisdiction; and (2) if so, does the exercise of jurisdiction comport with due process. *Id.* "The reach of the Florida long-arm statute is a question of Florida law[, and] federal courts are required to construe such law as would the Florida Supreme Court." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1271 (11th Cir. 2002) (internal quotation marks and citations omitted). "Absent some indication that the Florida Supreme Court would hold otherwise, federal courts are bound to adhere to decisions of its intermediate courts." *Id.* A plaintiff may meet its burden to show that the action falls within the ambit of Florida's long-arm statute "'by pleading the basis for service in the language of the statute without pleading supporting facts.'" *Kaminsky v. Hecht*, 272 So. 3d 786, 787–88 (Fla. 4th DCA 2019) (quoting *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989)). "Plaintiff may also allege specific facts demonstrating that the defendant's actions fit within one or more of the subsections of section 48.193, Florida's long-arm statute." *Id.* at 788 (internal quotation marks and citation omitted).

Florida's long-arm statute provides, in relevant part:

(1)(a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:

1. Operating, conducting, engaging in, or carrying on a business or business venture in [Florida] or having an office or agency in [Florida].

2. Committing a tortious act within [Florida].

. . .

    6.    Causing injury to persons or property within [Florida] arising out of an act or omission by the defendant outside th[e] state, if, at or about the time of the injury, either:

        a.    The defendant was engaged in solicitation or service activities within th[e] state; or

        b.    Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within th[e] state in the ordinary course of commerce, trade, or use.

    7.    Breaching a contract in [Florida] by failing to perform acts required by the contract to be performed in th[e] state.

*Fla. Stat.* § 48.193(1)(a).

Under Florida's long-arm statute, personal jurisdiction may be general or specific. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013) (citing Fla. Stat. § 48.193(1)-(2)). "General personal jurisdiction exists when a defendant 'is engaged in substantial and not isolated activity within [the] state . . . whether or not the claim arises from that activity,'" whereas specific personal jurisdiction exists over causes of action arising from a defendant's contacts with Florida that are related to the plaintiff's cause of action. *Id.* (citation omitted). In particular, the "tortious acts" provision in § 48.193(1)(a)(2), permits specific personal jurisdiction over nonresident "defendants committing tortious acts outside the state that cause injury in Florida." *Id.* at 1353-54 (citations omitted).

"Even though a statute may permit a state to assert jurisdiction over a nonresident defendant, the due process clause of the United States Constitution protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties, or relations." *Licciardello v. Lovelady*, 544 F.3d 1280, 1284 (11th Cir. 2008) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). "In specific

personal jurisdiction cases, we apply the three-part due process test, which examines: (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1355.  "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.* (internal quotation marks and citation omitted).  Moreover, a motion to dismiss for lack of personal jurisdiction should be addressed before a motion for failure to state a claim on Rule 12(b)(6) grounds. *Madara*, 916 F.2d at 1513-14, n.1.

### B.  12(b)(6) Motion to Dismiss

At the pleading stage, a complaint must contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief."  Fed. R. Civ. P. 8(a).  Although Rule 8(a) does not require "detailed factual allegations," it does require "more than labels and conclusions"; a "formulaic recitation of the cause of action will not do." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007).  To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 555, 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 556 U.S. at 679)).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of the complaint." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)).   A complaint's exhibits comprise "part of the plaintiff's basic factual averments."   *See F.T.C. v. AbbVie Prod. LLC*, 713 F.3d 54, 63 (11th Cir. 2013) (citation omitted).   Furthermore, exhibits govern when they contradict conclusory or general allegations in the complaint.   *Id.* (citations omitted).   In reviewing the complaint, the court must do so in the light most favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true.   *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007).   But "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citation omitted); *see also Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

### III.   <u>ANALYSIS</u>

#### A.   <u>Personal Jurisdiction</u>

Plaintiff concedes that the Court does not have general jurisdiction over the Defendants. (DE 20 at 4).   Rather, Plaintiff contends that Defendants are subject to the specific jurisdiction of the Court.   *Id.*   Defendants argue that Plaintiff failed to make a *prima facie* showing that specific jurisdiction exists under Florida's long-arm statute.   (DE 11 at 9-10; DE 21 at 2).   Defendants also argue that Plaintiff has not established the constitutional elements to satisfy due process.   (DE 11 at 10-11; DE 21 at 2).   In its Response, Plaintiff argues that Defendants committed a tortious act in Florida by virtue of Defendants' misrepresentations to Plaintiff.   (DE 20 at 5).   Plaintiff further

asserts that Defendants caused harm to Plaintiff in Florida. *Id.* For the reasons stated below, I find that Plaintiff has carried its burden to allege facts sufficient to establish specific jurisdiction under Florida's long-arm statute and that the Court's exercise of specific jurisdiction is consistent with the requirements for due process.

### 1. **Florida's Long-Arm Statute**

Here, I find that Plaintiff's allegations are sufficient to establish that personal jurisdiction exists under the "tortious acts" subsection of Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(2). As more fully discussed below, Plaintiff alleged trademark infringement under Florida common law (Count I), which is treated as a tortious act for purposes of personal jurisdiction. *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1353. Further, Plaintiff pled federal and state unfair competition causes of action (Counts II and III), which courts also find "involve 'tortious acts' under the Florida long-arm statute." *Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1239–40 (S.D. Fla. 2015). Additionally, Plaintiff pled a cause of action for fraudulent inducement, which Florida recognizes as an intentional tort. *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996); *Brennan v. Roman Cath. Diocese of Syracuse New York, Inc.*, 322 F. App'x 852, 855 (11th Cir. 2009) (citing *Windstar Club, Inc. v. WS Realty, Inc.*, 886 So.2d 986, 987 (Fla. 2d DCA 2004)).

Plaintiff did not allege tortious acts as a basis for jurisdiction under the jurisdiction and venue section of its Complaint. Rather, Plaintiff argues in its Response that Defendants committed a tortious act in Florida. (DE 20 at 5). I find that the Complaint, however, alleged sufficient specific facts to demonstrate tortious acts for purposes of personal jurisdiction. Thus, while not ideal that Plaintiff failed to list tortious acts as a basis for personal jurisdiction under the jurisdiction section of the Complaint, I conclude that such failing is not fatal in this case. *See*

*Kaminsky*, 272 So. 3d at 788 (providing for plaintiff to allege "specific facts").  *See also Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002) (holding that "[t]he threshold question that must be determined [regarding personal jurisdiction for a tort committed in Florida] is whether the allegations of the complaint state a cause of action").  Furthermore, because I find that the Court may exercise personal jurisdiction over the Defendants on the basis of Plaintiff's causes of action for tortious acts, such as common law trademark infringement and unfair competition, I conclude that it is unnecessary to reach Plaintiff's alternative grounds for exercising personal jurisdiction. *Lovelady*, 544 F.3d at 1284, n.2 ("Because the court holds that [the tortious acts provision of] Fla. Stat. § 48.193 . . . is satisfied, we do not address [plaintiff's] assertions that jurisdiction lies under other sections of the statute as well.").

As to trademark infringement, the legal standards for alleging common law and statutory trademark infringement are essentially the same: (1) a plaintiff acquired substantive rights to a certain name or mark; (2) a defendant's unauthorized use of an identical or confusingly similar mark is in competition with plaintiff in the same trade areas; (3) and defendant's actions will likely result in customer confusion.  *Tally–Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1025-26, n.14 (11th Cir. 1989).  Common law "substantive rights to a mark arise based on use in commerce and distinctiveness of the mark."  *Direct Niche, LLC v. Via Varejo S/A*, No. 15-CV-62344, 2017 WL 5952896, at *5 (S.D. Fla. Aug. 10, 2017), *aff'd,* 898 F.3d 1144 (11th Cir. 2018) (citing *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011).  "To [demonstrate] common-law rights to a trademark, a party must [allege] prior use of the mark in commerce.  Prior use, in turn, is [shown by], first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods [or services] in an appropriate segment of the public mind as those

of the adopter of the mark." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1131 (11th Cir. 2018) (citation omitted).

Here, Plaintiff alleged that it organized under the laws of the State of Florida and has principal places of business in Florida and North Carolina.  (DE 1-1 at ¶2).  Plaintiff also alleged that it has used marks of a "highly stylized design" to promote itself ("RED Marks") since 2016 on its website and in selling goods to raise funds, among other uses.  *Id.* at ¶¶11-14.  Plaintiff additionally alleged that it acquired common law ownership of the Red Marks prior to Defendants' use.  *Id.* at ¶¶16, 28.  Further, Plaintiff alleged that, because of the reputation Plaintiff built in and around Florida and North Carolina using the Red Marks, Defendant contacted Plaintiff to use its RED Marks in a co-sponsorship of NASCAR races.  *Id.* at ¶17.  Defendant does not challenge these allegations.  Thus, I find that Plaintiff has sufficiently pled that it acquired substantive rights to the Red Marks based on use in commerce (Internet website that solicits funds and sells merchandise) and distinctiveness of the mark (highly stylized design).

According to Plaintiff, Defendants made a copycat website and Facebook page ("Competing Internet Platforms") using a confusingly similar mark to Plaintiff's Red Marks.  *Id.* at ¶¶23, 27.  Plaintiff also alleged that Defendants are selling printed shirts through its Competing Internet Platforms.  *Id.* at ¶32.  Further, Plaintiff alleged that Defendants are using the Competing Internet Platforms to offer competing charitable services, which actions "have [actually] caused and are likely to continue to cause confusion." *Id.* at ¶¶33, 35.  Plaintiff also cited specific incidents of customer confusion.  *Id.* at ¶¶36-40.  Because Plaintiff alleged that Defendant is using the confusingly similar marks on Competing Internet Platforms to offer competing charitable services and shirts for sale, I find that Plaintiff sufficiently alleged that Defendants' unauthorized use of the similar marks is competing with Plaintiff in the same trade areas.  Thus, I conclude that Plaintiff

has adequately pled trademark infringement under Florida common law sufficient to establish a *prima facie* case that the Court has specific jurisdiction over Defendants under § 48.193(1)(a)(2). *See Louis Vuitton Malletier, S.A.*, 736 F.3d at 1353-54 (noting that "Louis Vuitton's trademark claims allege 'tortious acts' for purposes of Florida's long-arm statute" and that "trademark infringement on an Internet website causes injury and occurs in Florida 'by virtue of the website's accessibility in Florida'" (quoting *Lovelady*, 544 F.3d at 1283)).  As noted previously, Defendants do not challenge Plaintiff's factual averments.  Thus, I conclude that Plaintiff has sufficiently pled that specific personal jurisdiction exists under Florida's long-arm statute.

As more fully discussed *infra*, Plaintiff adequately pled unfair competition under Florida common law.  Common law unfair competition also involves tortious acts for purposes of personal jurisdiction.  *Hard Candy, LLC*, 106 F. Supp. 3d 1231, 1239–40 (S.D. Fla. 2015).  Thus, I find that Plaintiff demonstrated that Florida's long-arm statute extends to provide personal jurisdiction over Defendants on the basis of Plaintiff's allegations pertaining to unfair competition under Florida common law.  Given that Plaintiff has satisfactorily pled the existence of personal jurisdiction under Florida's long-arm statute on the basis of trademark infringement and unfair competition, as I stated previously, I find it unnecessary to reach whether personal jurisdiction exists on the basis of Plaintiff's other allegations.  *Lovelady*, 544 F.3d at 1284, n.2

### 2.  Due Process Clause

Defendant argues that Plaintiff does not meet its burden to establish Defendants' minimum contacts with Florida.  (DE 11 at 10-11; DE 21 at 7).  I disagree for the following reasons.

### i.  Prong One – Relatedness

"A relationship among the defendant, the forum, and the litigation is the essential foundation of [personal] jurisdiction."  *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1356 (internal

quotation marks omitted) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).  "[M]ere injury to a forum resident is not a sufficient connection to the forum. [Rather,] . . . [t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden v. Fiore*, 471 U.S. 277, 290 (2014).[2]  In other words, the Plaintiff cannot be the only connection between Defendants and the forum.

Here, however, Plaintiff's claims arise out of Defendants' activities with other residents of the forum.  Defendants' injury of Plaintiff is not the only contact that Defendants have with Florida. Specifically, Defendants are allegedly using an almost identical domain name to Plaintiff to raise funds and market its services in Florida through its Competing Internet Platforms.  Thus, Plaintiff's claims relate to Defendants' contacts with Florida that connect Defendants to Florida in a meaningful way.  Defendants' conduct allegedly redirects Plaintiff's "website and Facebook traffic" to Defendants' Competing Internet Platforms, presumably including Florida residents who are potential donors to, and beneficiaries of, Plaintiff's charitable services.  (DE 1-1 at ¶¶32-34). While Plaintiff does not specifically allege that Defendants' Competing Internet Platforms are accessible by Florida residents, a reasonable inference is that Defendants take advantage of Plaintiff's "goodwill" by using their Competing Internet Platforms to market and sell to Florida residents using a nearly identical logo to Plaintiff.  *Id.* at ¶¶32, 34.  Thus, I find prong one is satisfied.  *See JCS Indus. LLC v. DesignStein LLC*, No. 619CV544ORL37EJK, 2019 WL 5391192, at *6, n.10 (M.D. Fla. Oct. 22, 2019) (finding conduct of defendants meaningfully connected where "[d]efendants' Website was discovered based on a simple typographical error made by one of

---

[2] The *Walden* court stated in a footnote that the case did not present the question of whether a defendant's virtual conduct translates into "contacts" with a state, and it left "questions about virtual contacts for another day."  *Id.* at n.9.

Plaintiff's employees in Florida . . . [and where] Plaintiff allege[d] this was all 'to capitalize on typographical errors committed by Plaintiff's existing and prospective customers'" ).

### ii.  __Prong Two – Purposeful Availment__

"In *intentional* tort cases, there are two applicable tests for determining whether purposeful availment occurred": the effects test and a traditional purposeful availment, or "minimum contacts" test.  *Id.* (emphasis in original).  Because I find that Plaintiff's allegations are sufficient under the effects test, I do not conduct an analysis under the traditional minimum contacts test.

"Under the 'effects test,' a nonresident defendant's *single* tortious act can establish purposeful availment . . . [if] the tort: (1) was intentional; (2) was aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Id.* (internal quotation marks and citations omitted) (emphasis added).  Here, the first two elements are satisfied because Plaintiff alleged that Defendants committed intentional torts against Plaintiff, who was organized and has a principal place of business in Florida.  Additionally, similar to what the Court in *Lovelady* found, Defendants should have anticipated that harm from the allegedly tortious acts aimed at Plaintiff, who has a principal place of business in Florida, would be felt in Florida.  544 F.3d at 1288.  Defendant Hirsch understood from his initial communications that Plaintiff's founder was located in Florida.  (DE 1-1 at pp. 106-107).  Further, Plaintiff alleged that it was Plaintiff's reputation in and around Florida and North Carolina that prompted Defendant Hirsch to contact Plaintiff.  *Id.* at ¶¶15-17.  Therefore, I conclude that Plaintiff's allegations satisfy the effects test, and [t]he Constitution is not offended by the exercise of Florida's long-arm statute to effect personal jurisdiction over [Defendants]." *Lovelady*, 544 F.3d at 1288 (holding that the effects test is satisfied by "the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum").  Thus, prong 2 is satisfied.

### iii. **Prong Three – Fair Play and Substantial Justice**

The following factors are considered in analyzing whether exercising personal jurisdiction comports with notions of fair play and substantial justice: "(1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute." *Louis Vuitton Malletier, S.A.*, 736 F3d at 1358 (internal quotation marks and citation omitted). I find that the exercise of personal jurisdiction over Defendants does not offend notions of fair play and substantial justice for the below-stated reasons.

First, Defendants offer no evidence, nor even complain, about the burden related to litigating the case in Florida. Second, Florida has a strong interest in protecting its citizens from unfair competition and trademark infringement. Third, Plaintiff's founder is a resident of Florida and Plaintiff has a principal place of business in Florida, indicating that Plaintiff has strong interest in litigating in Florida as its chosen forum. Fourth, the judiciary has an interest in efficiently resolving the dispute in the forum where the parties have now retained local counsel and where at least some of the relevant events giving rise to the instant case have taken place. Thus, prong 3 is satisfied. Accordingly, for all the reasons stated, I conclude that the Court's exercise of personal jurisdiction over the Defendants does not violate due process.

### B. **Merits Analysis of Counts III and IV**

#### 1. **Count III – Unfair Competition Under Florida Common Law**

I find that Plaintiff's pleadings with respect to Count III are sufficient to survive a motion to dismiss. Under Florida's common law, "[u]nfair competition is a doctrine grounded in 'fairness, decency and common honesty.'" *Glob. Tech Led, LLC v. Hilumz Int'l Corp.*, No. 2:15-CV-553-FTM-29CM, 2017 WL 588669, at *7 (M.D. Fla. Feb. 14, 2017) (quoting *Sentco, Inc. v. McCulloh*,

68 So. 2d 577, 580 (Fla. 1953)).  Indeed, "'[t]he law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'"  *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1353 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) (quoting *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)).  In *Sentco*, the Florida Supreme Court also held that "[a] person cannot use [even] his own name if it is done with the fraudulent intent of appropriating the good will of a business established and built up by another person of the same name." 68 So. 2d at 580.  Consistent with these principles, the Eleventh Circuit more recently reiterated that "[u]nfair competition under Florida common law requires 'deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion.'" *Webster v. Dean Guitars*, 955 F.3d 1270, 1277 (11th Cir. 2020) (quoting *Donald Frederick Evans & Assocs., Inc.*, 785 F.2d at 914).   Here, Plaintiff's specific allegations are sufficient to allege deceptive conduct and likely consumer confusion.   Count III alleged that Defendants misappropriated Plaintiff's R.E.D. branding, including the RED logos, to create a confusingly similar website with the domain name of "remembereveryonedeployed.today."  (DE 1-1 at ¶64). Plaintiff specifically alleged that Defendants falsely represented that the goods and services they promoted, advertised, offered for sale and distributed via their Competing Internet Platforms are connected with, or authorized by, Plaintiff, who owns the common law trademark rights in the R.E.D. branding and logos.  *Id.*  In addition, Plaintiff alleged that Defendant Hirsch made promises to Plaintiff with the ulterior motive of creating a copycat website and Facebook page that competes with Plaintiff by targeting deployed servicemembers and their families for charitable services.  *Id.* at ¶¶27, 32.   According to Plaintiff, Defendants redirect would-be visitors, donors, and beneficiaries of Plaintiff's charitable services to these copycat platforms.  *Id.* at 32.  Furthermore,

Plaintiff alleged that Defendants' platforms provide "printed shirts and marketing materials using the R.E.D. Branding and the RED Logo, which are available for sale" through these platforms. *Id.* at ¶¶23, 32. Plaintiff also alleged specific instances of customer confusion. *Id.* at ¶¶36-40.

Thus, as Plaintiff argues, it pled that Defendants' deceptive conduct tricked a common pool of customers into believing that Defendants were Plaintiff and those customers patronized Defendants while holding this belief. Plaintiff also pled that Defendants engaged in deceptive conduct to appropriate for their own benefit the goodwill and reputation that Plaintiff built, and Plaintiff pled specific examples of how customers were confused by Defendants' unauthorized use of Plaintiff's branding and mistook Defendants as Plaintiff. (DE 1-1 at ¶¶36-40). By engaging in such conduct, Defendants would necessarily become a competitor of Plaintiff. Therefore, I find that Plaintiff's allegations are sufficient to state a claim for unfair competition under Florida's common law.

### 2.  Count IV – Breach of Contract

For the reasons stated below, I find that Plaintiff fails to sufficiently plead a claim for breach of contract.[3]

"Under Florida law, a plaintiff alleging breach of contract must plead: '(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach.'" *Kelley v. Metro. Life Ins. Co.*, No. 13-61864-CIV, 2013 WL 5797367, at *2 (S.D. Fla. Oct. 28, 2013) (quoting *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir.2009)). "With regard to alleging the existence of the contract, 'a plaintiff must plead: (1) offer; (2) acceptance; (3)

---

[3] Because I find that Plaintiff fails to demonstrate that the parties reached agreement on all essential terms in order to create an enforceable contract, I conclude that Defendants' statute of frauds' argument is moot and do not address it further.

consideration; and (4) sufficient specification of the essential terms.'" *Id.* (quoting *Vega*, 564 F.3d at 1272).

"[A]cceptance [of an offer] is effective to create a contract only if it is absolute and unconditional, and identical with the terms of the offer." *Giovo v. McDonald*, 791 So. 2d 38, 40 (Fla. 2d DCA 2001) (citing *Ribich v. Evergreen Sales & Serv., Inc.*, 784 So.2d 1201(Fla. 2d DCA 2001)). "An attempted acceptance can become a counteroffer [and a rejection of an original offer] 'either by adding additional terms or not meeting the terms of the original offer.'" *Pena v. Fox*, 198 So. 3d 61, 63 (Fla. 2d DCA 2015) (quoting *Grant v. Lyons*, 17 So.3d 708, 711 (Fla. 4th DCA 2009)). Furthermore, "what is an 'essential term' of a contract differs according to circumstances." *Id.* "The party seeking to enforce a purported agreement has the burden of establishing assent to the essential terms by the opposing party." *Triton Stone Holdings, L.L.C. v. Magna Bus., L.L.C.*, 308 So. 3d 1002, 1007 (Fla. 4th DCA 2020).

Count IV alleged that Defendants failed to honor the terms of an agreement for use of Plaintiff's branding and logo in sponsoring NASCAR races. (DE 1-1 at ¶¶72-78; DE 20 at 7)). Plaintiff alleged that Defendants offered a NASCAR Cup Series co-sponsorship to Plaintiff on December 20, 2019, which Plaintiff *conditionally* accepted on December 21, 2019 subject to Defendants providing a mockup of where the logo would be placed on the sponsored car. (DE 1-1 at ¶¶72-73). On January 4, 2020, Defendants sent the mockup. *Id.* at ¶74. Plaintiff does not allege that it approved of, or accepted, Defendants' proposal for placement of its logo on the car. Thus, I find that Plaintiff failed to establish the existence of a  binding agreement between the parties at this stage of the parties' negotiations.

Plaintiff then alleged that, in exchange for Plaintiff authorizing use of its logo and giving Defendants access to its website and Facebook page, Defendants agreed to fix certain aspects of

these platforms, to provide at least $52,000 in income to Plaintiff for travel and to use Plaintiff's logo to sponsor eight races. *Id.* at ¶75. Plaintiff alleged that it performed under the agreement by providing its logo, by providing confidential access to its website and Facebook page, and by Plaintiff's representatives travelling to locations as requested by Defendants. *Id.* at ¶76. Plaintiff contended that Defendants breached the agreement by failing to complete the "fixes" promised in the Feb. 19th Email, by failing or refusing to sponsor eight races wherein Plaintiff's logo would be run, and by launching a copycat website and Facebook page offering competing charitable services using Plaintiff's logo and branding. *Id.* at ¶79. Plaintiff pled damages in the form of lost profits, lost opportunity and reputational harm. *Id.* at ¶80. However, Plaintiff failed to sufficiently allege how and when the parties reached a meeting of the minds on the essential terms of this purported agreement.

Plaintiff argues that Defendant Hirsch set forth the essential terms of the parties' agreement in the Feb. 19th Email except that "after agree[ing] to essential terms . . . [the parties] could not come to agreement on the website overhaul in an effort to monetize it." (DE 20 at 8) (referencing DE 1-1 at p. 23). The full exchange between the parties as proffered by the Complaint's exhibits, however, belies that there was a meeting of the minds on essential terms. Furthermore, contrary to Plaintiff's averment, the parties' lack of agreement was about more than the website overhaul, and, even with respect to the website overhaul, the parties lack of agreement entailed more than monetization of the website. Even though the parties' lack of agreement on the website overhaul alone is reason to find no enforceable contract was formed, I also find that the parties failed to reach a meeting of the minds about other essential terms in order to form a binding contract.

The Feb. 19th Email stated: "so far we have agreed that Spartan will" and then proceeded to identify specific "fixes" that Defendants would make to Plaintiff's website and Facebook page

as detailed *supra*.  (DE 1-1 at p. 23).  The Feb. 19th Email ended with: "[l]et me know your thoughts." *Id.*  "The creation of a contract requires that there be mutual assent to a certain and definite proposition. Where essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract." *ABC Liquors, Inc. v. Centimark Corp.*, 967 So. 2d 1053, 1056 (Fla. 5th DCA. 2007).  The beginning language, "so far we have agreed," suggested that negotiation was ongoing and a work in progress. (DE 1-1 at p. 23).  As later communications confirm, the scope of work that Defendants agreed to was left undefined at this point in time.  Thus, I conclude that the allegations fail to show the parties achieved mutual assent in order to form a binding agreement at the time of the Feb. 19th Email.

Following the Feb. 19th Email, Plaintiff sent the First Feb. 26th Email to Defendant Hirsch stating that it would be "[c]reating a detail[ed] outline . . . of our past overall strategic conversations to be deployed ASAP. . . . It [w]ill include our mutual R.E.D *social media*, *strategic marketing/Platform deployment*." *Id.* at p. 103.  Thus, Plaintiff clearly indicated in the First Feb. 26th Email that it would be modifying, or at least more specifically defining, what Defendants set forth in the Feb. 19th Email with respect to marketing generally and with respect to platform deployment broadly.  Plaintiff's strategy for its marketing and how the deployment of its platforms would support its marketing are essential terms because these matters provide the overarching guidance for the more specific changes to Plaintiff's social media and platforms that Defendants would make.  Without agreement as to these parameters, Defendants would not have authority to make any of the changes the parties were discussing. Thus, I conclude that the Feb. 19th Email set forth Defendants' understandings of only some of the material terms between the parties. Plaintiff's First Feb. 26th Email alerted Defendants to Plaintiff's intention to modify or define

what Defendants would do, and the parties then failed to come to agreement about those material terms.

As further indication of the parties' failure to achieve mutual assent, on March 3, 2020, Plaintiff sent the Mar. 3rd Letter outlining Plaintiff's "vision for the website overhaul." *Id.* at ¶26; pp. 44-54. The website overhaul was central to the agreement that the parties were discussing because the website represents a major component of Plaintiff's platforms intended to deploy its marketing strategy. *Id.* at pp. 44-54. Thus, I conclude that website overhaul was an essential term of the purported agreement, and the parties failed to agree about this essential term as Plaintiff concedes. (DE 21 at 10).

Furthermore, the parties' correspondence provided other indications that they failed to come to a mutual agreement in order to form an enforceable contract. Although the First Feb. 26th Email stated "[a]ll strategic thus far discussed and agreed, will be activated, by today," Plaintiff did not explain any details describing what such "agreement" about "strategic" entailed. *Id.* The First Feb. 26th Email also stated: "[a]s accord, please introduce and place me in the R.E.D-Spartan strategy IT and marketing team communication group." *Id.* Plaintiff pled nothing to indicate, however, that such "accord" took place. Plaintiff made no averment that it was ever "introduced" and/or "placed" as it requested in the First Feb. 26th Email. Then, later that day, Defendant Hirsh sent to Plaintiff the Second Feb. 26th Email with the subject "[h]ere is the baseline stuff my team is looking at making to start with," which Plaintiff averred included a mockup of changes to Plaintiff's website. (DE 1-1 at ¶25; p. 31). Plaintiff did not assert, however, that it agreed to any of Defendants' "baseline stuff." In the absence of further explanation or additional facts, even taking the allegations in the light most favorable to Plaintiff, I am unable to conclude that the

parties agreed on anything that was discussed in the referenced correspondence nor is it clear exactly what was being discussed.

Plaintiff requests an opportunity replead.  (DE 20 at 10).  Accordingly, for the above-state reasons, I recommend that Defendants' Motion to Dismiss Count IV be granted without prejudice so that Plaintiff may replead Count IV, if it can, to demonstrate the existence of a binding agreement between the parties.

**IV.    CONCLUSION**

For the foregoing reasons, I respectfully **RECOMMEND** that Defendants' Motion to Dismiss (DE 11) be **GRANTED IN PART** and **DENIED IN PART**.  Specifically, I recommend as follows:

1.  That the Motion to Dismiss be **DENIED** as to the Court's lack of personal jurisdiction over Defendants;

2.  That the Motion to Dismiss be **GRANTED** as to **Count IV** for failure to state a claim;

3.  That **Count IV** be **DISMISSED** without prejudice for Plaintiff to replead; and

4.  That the Motion to Dismiss be **DENIED** as to **Count III** with respect to failure to state a claim.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.  Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained

in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28

U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790,

794 (1989); 11th Cir. R. 3-1 (2016).

      **DONE** and **SUBMITTED** in Fort Lauderdale, Florida, this 8th day of March 2021.

**Jared M. Strauss**
**United States Magistrate Judge**

Copies furnished via CM/ECF to:

Hon. Rodolfo A. Ruiz, II
Counsel of record